UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
LARRY JOHNSON,                          :
                         Plaintiff,     :
                                        :      03 Civ. 5276 (DLC)
            -v-                         :
                                        :      OPINION & ORDER
CHARLES GREINER, SUPT., WILLIAM J.      :
CONNOLLY, DSS., J. McNAMARA, SGT., W.   :
MACK, SGT., GLENN GOORD, COMM. OF DOCS, :
DONALD SELSKY, DIR. OF SHU.,            :
                         Defendants.    :
                                        :
----------------------------------------X

Appearances:

Pro Se Plaintiff:
Larry Johnson
584 Logan Street
Apt. 1C
Brooklyn, NY 11028

For Defendants:
Steven Neil Schulman
Office of the Attorney General
New York State
120 Broadway
New York, NY 10271


DENISE COTE, District Judge:

    Larry Johnson ("Johnson"), proceeding pro se, brings this

action pursuant to 42 U.S.C. § 1983 against defendants Charles

Greiner ("Greiner"), Sing Sing Correctional Facility ("Sing

Sing") Superintendent; William J. Connolly ("Connolly"), Sing

Sing Deputy Superintendent; J. McNamara ("McNamara"), Sing Sing

Sergeant; W. Mack ("Mack"), Sing Sing Sergeant; Glenn Goord

("Goord"), New York State Department of Correctional Services
Commissioner; and Donald Selsky ("Selsky"), Special Inmate
Disciplinary Program Director.  Johnson alleges that the
defendants deprived him of due process of law at several stages
of a prison disciplinary proceeding brought against him in
December of 1999.  As a result that proceeding, Johnson was
moved into the Special Housing Unit ("SHU") at Sing Sing, where
he was housed for over six months.  While in the SHU, Johnson
alleges that he was beaten by corrections officers, that his
personal property was destroyed, and that he was made to strip
in the presence of a female corrections officer.  Johnson also
alleges that the disciplinary proceeding in question was
commenced against him in furtherance of a conspiracy among all
of the defendants to retaliate against him because of his
popularity in the prison and because he refused to cooperate
with the defendants in spying on fellow inmates.

In proceedings before Magistrate Judge Kevin Fox,[1]
defendants filed a motion for summary judgment, pursuant to Fed.
R. Civ. P. 56, seeking dismissal of all of Johnson's claims.  On
July 16, 2007, Judge Fox issued a report ("Report") recommending
that (1) summary judgment be granted as to all claims against

---

[1] This case was originally assigned to the Honorable Richard
Casey, and referred to Magistrate Judge Fox for general pretrial
supervision and for a report and recommendation on any
dispositive motion.  The case was reassigned to this Court on
May 21, 2007.

defendants Greiner, Goord, and Selsky, and as to Johnson's
conspiracy claim, but (2) that material issues of disputed fact
required the denial of the motion with respect to the claims
against defendants Connolly, McNamara, and Mack.  The Report
also concludes that while the defendants are not entitled to
qualified immunity as to any of Johnson's claims, any claims for
damages against the defendants in their official capacities are
barred by the Eleventh Amendment.

   Defendants timely submitted objections to those portions of
the Report recommending partial denial of their motion for
summary judgment, but did not object to the Report's finding
that Johnson had raised a material issue of fact as to whether
his placement in the SHU, as well as the events that took place
while he was in the SHU, implicated his liberty interests under
the Due Process Clause.[2]  Johnson timely submitted an objection
to the Report's conclusion that his claims against the
defendants in their official capacities are barred by the
Eleventh Amendment.

   For the reasons stated in greater detail below, the
Report's recommendations are adopted in part and rejected in
part, and defendants' motion for summary judgment is granted in
part and denied in part.  In short, the record reveals that

---

[2] Defendants do state that they "reserve their rights on the
issue if there is a trial."

3

Johnson's disciplinary hearing was tainted by the troubling confluence of deficient notice and inadequate assistance.  In addition, although Johnson was able to overcome these hurdles and present evidence during the hearing that thoroughly discredited one of the two confidential informants who testified against him, the allegations made by the remaining witness were not adequately probed by the hearing officer, and Johnson was not provided the factual details necessary to rebut those allegations.  The combined result of these procedural missteps was that Johnson's disciplinary hearing concluded with a result that was not adequately supported by reliable evidence.

<u>BACKGROUND</u>

The following facts, drawn from the record the parties have presented on summary judgment, are undisputed or taken in the light most favorable to the plaintiff, unless otherwise indicated.  In December 1999, Johnson was incarcerated in the Tappan annex to Sing Sing, where he was employed as an Inmate Liaison Committee ("ILC") representative.  On or about December 3, a search was conducted of Johnson's personal property and cubicle while he waited outside.  During the search, a corrections officer reported that he found a list of correction officers' names among Johnson's personal effects, as a result of which Johnson was restrained, strip searched, transported from

4

Tappan to Cell Block-A in Sing Sing, and placed in a "keep-locked" status.

On December 4, Johnson was served with a misbehavior report charging him with harassment, soliciting sex, and possession of contraband.  The charges contained in that report were subsequently dismissed.

On the afternoon of December 5, Johnson was served with another misbehavior report, charging him with participating in and urging others in action detrimental to facility order, and with conduct with the threat of violence.  The report was signed by defendant McNamara, and provided the following "description of incident": "[i]nformation gathered in an ongoing investigation into inmate group actions designed to disrupt the order of the facility has identified this inmate as urging others to join this action and indicating that violence may result if they do not participate."

Following his receipt of the misbehavior report, Johnson was given the opportunity to choose, from a list of corrections employees, an assistant to help him prepare for the hearing on the charges contained in the second misbehavior report.  Johnson chose defendant Mack, with whom he met on December 7.  At that time, Johnson asked Mack to interview witnesses, collect written statements, obtain any "Unusual Incident" reports, as well as any other documentary evidence -- including, inter alia, the

"inmate rule book," a copy of Department of Correctional Services' Directive Chapter V ("Chapter V"), any relevant "TO/FROM reports," and other reports, memoranda, and recordings created by anyone in the prison -- that would be relevant to the charges contained in the misbehavior report.[3]

Johnson had a second meeting with Mack on December 10. Mack provided Johnson with copies of the inmate rule book and Chapter V, but none of the other requested information.  During the meeting, Johnson noticed that the door to the room in which he and Mack were speaking was slightly open, and that Connolly was in the next room.  Johnson brought this issue to Mack's attention but no action was taken.

On December 11, Mack came to Johnson's cell and asked him to sign an "Assistant Form" that purported to detail the requests made by Johnson and the actions taken by Mack in response to those requests.  Johnson refused to sign the form

---

[3] In Johnson's amended affidavit submitted in opposition to the motion for summary judgment, Johnson avers that, during this December 7 meeting, he also asked Mack to collect documents and testimony regarding any statements made by Johnson related to an inmate uprising while attending meetings of the Alcohol and Substance Abuse Treatment group ("ASAT").  Whether Johnson could have been aware, on December 7, of the allegations regarding his conduct during such meetings cannot be reliably determined from the record here.  As will be discussed below, it appears from the hearing transcript that Johnson was not aware of such allegations until, during the hearing on December 13, he was provided with a copy of a memorandum from defendant McNamara to defendant Connolly, dated December 5, 1999 ("December 5 Memo"), which contained reference to these allegations.

because he believed that Mack had "fail[ed] to fulfill the most important part of his inmate assistant obligation," namely, to obtain the documentary evidence and written statements necessary for Johnson to mount a defense against the charges contained in the misbehavior report.

The hearing began on the morning of December 13, with defendant Connolly presiding.[4]  Connolly read the misbehavior report to Johnson, who then pleaded not guilty to the charges. Johnson was asked if there were any witnesses he wished to call, and he replied, "I have no witnesses," but requested to see the information in support of the charges.  Johnson also requested an opportunity to speak with the person making the accusations against him, or to see a written statement or tape of a statement from that person, in order to determine the evidentiary basis for McNamara's misbehavior report.  Connolly agreed to call McNamara as a witness, and indicated his assent to Johnson's document request.

McNamara was then called into the room and testified that "more than one source, who has been reliable in the past, identified this inmate as participating in these actions" and as "making threats to people to participate in" a planned

---

[4] A transcript of the audio recording of the hearing, including the confidential discussion between McNamara and Connolly, was submitted in support of the defendants' motion.  The accuracy of the transcript has not been disputed.

demonstration at the facility.  Johnson sought more specific information regarding to whom he was alleged to have made these threats, but McNamara stated that providing Johnson with "specific times, dates, and actions" would "compromise the confidential sources."  Connolly then stated that he would "do a review of those confidential informants."

In response to McNamara's testimony, Johnson requested the right to call three witnesses: corrections officers Benedito and Hicks, and an inmate named Deputy.  Johnson stated that these witnesses could testify that they had never heard him make any of the threats described by McNamara.  Johnson also requested specific information as to the dates and times he was alleged to have been making these threats, in light of the fact that he was rarely out of his "cube," other than at meal times and holidays, or to attend classes and go to the ILC office.  Johnson called into question the reliability of McNamara's report and the credibility of his confidential informant, based on Johnson's observation that he had seen identical misbehavior reports issued against at least four other inmates.  Connolly agreed to call these witnesses and provide Johnson the dates and times requested, and then adjourned the hearing to conduct a confidential session with McNamara to review the information provided by McNamara's informants.

During this recess, Johnson was given a copy of a memorandum from McNamara to Connolly, dated December 5, 1999 ("December 5 Memo"), which provided some additional detail regarding the factual basis for the charges.  The December 5 Memo states, in relevant part:

> I have conducted an investigation into an inmate mass demonstration to begin on 12/1/99 with inmate[s] "Stated Down" and including an inmate program refusal planned for 1/1/00.  Confidential sources have identified this inmate as being involved in the recruiting for and implementation of this action.  The confidential sources stated that [Johnson] in concert during ASAT meetings and on his housing unit actively urged other inmates to take action in protest of Corrections, Parole, and Governor Pataki's policies. These sources further stated that this inmate used his ILC status to recruit other inmate[s] to become involved in this demonstration. . . . After 12/1/99 this inmate began to threaten other inmates with physical harm and destruction of personal property if they did not participate in the [demonstration]. . . . The sources of this information are independent of each other and have personal knowledge of this inmate's involvement.

While Johnson examined the December 5 Memo, Connolly and McNamara conducted a confidential colloquy to review the evidence provided by McNamara's sources.  After Connolly read the December 5 Memo into the record,[5] McNamara revealed that an inmate named Benjamin, who was already in the SHU for his role in the planned disturbance, named Johnson as one of the inmates

---

[5] McNamara clarified that the "incident date" listed on the report, "11/25/99 at 11 a.m.," did not refer to the time at which Johnson was alleged to have taken any relevant action, but rather was the time at which Johnson was first named by the informant.

involved in the planning of the event.  Benjamin told McNamara
that "Johnson's role was to encourage others to get the word out
and report back to the committee on people who were not
complying."  McNamara said that he believed Benjamin's
information to be credible because the other information he
provided about the planned protest was confirmed by independent
sources, and because Benjamin "was well aware of all
participants [and] was part of the committee planning this."
McNamara also reported that he questioned Benjamin regarding his
motives for coming forward, and that Benjamin stated that he was
concerned that the protests would turn violent, which he did not
support.  Connolly then asked if other informants had tied
Johnson specifically to the protest, and McNamara informed him
that an inmate named Prentice had told McNamara that "he
attended [ASAT] meetings in which Inmate Johnson promoted and
urged other[s] to participate" in the protest, and that when
Prentice did not agree to do so, an ignited book of matches was
thrown onto his bed.  Prentice further stated that Johnson was
the leader of his ASAT group, and that he used the ASAT meetings
"as a forum to promote this demonstration."  The colloquy
concluded with Connolly noting the fact that McNamara had served
seventeen years as a corrections officer, including fourteen on
the "Crisis Intervention Team," and was an "expert" in
interviewing and investigations.

Following the confidential colloquy, the hearing was resumed in Johnson's presence.  Connolly began by stating that, "I have reviewed, on a confidential tape, Sergeant McNamara's confidential informants, and I will make a determination as to their credibility, but as of right now, they appear to be credible."  Connolly then noted for the record that Johnson had been provided a copy of the December 5 Memo and that the hearing would be adjourned for twenty-four hours so that Johnson could review its contents.  In response, Johnson requested that ASAT counselor Walker be called to testify, and that Johnson be provided with copies of the ASAT sign-in sheet for the past two months.  Johnson stated that he was not a member of ASAT and had never been to an ASAT meeting, and therefore the accusation recounted in the December 5 Memo that he had made threats during ASAT meetings was demonstrably false.[6]

The hearing reconvened three days later, on December 16.  Correction Officer Acevito, who was assigned to Johnson's unit in Tappan, testified that he had never heard Johnson make any threats or conduct any recruiting associated with the planned protest.  Acevito also testified, under questioning from

---

[6] The recording of this portion of the hearing "abruptly stopped" at this point.

Connolly, that it would not be possible to attend an ASAT
meeting without signing in for that meeting.[7]

At the conclusion of Acevito's testimony, Connolly noted
that he had not been able to secure the attendance of officers
Hicks or Benedito.  Johnson stated that he still wanted them to
testify, and Connolly agreed to "ask for an extension of this
Hearing to get those witnesses."  Connolly and Johnson also
discussed, inter alia, the accusation contained in the December
5 Memo stating that Johnson had used his ILC status to recruit
other inmates to participate in the demonstration.  Johnson
repeatedly denied that allegation.

The hearing concluded on December 21.  Connolly opened by
stating that he had been unable to bring Hicks and Benedito to
testify, and asked Johnson to provide some detail as to what he
believed they would say if they were available.  Johnson said
that Hicks and Benedito had worked on his unit at Tappan, and
that they would testify that they had never heard him making
threats or urging inmates to participate in any type of

---

[7] Defendants have submitted a memorandum, dated December 15,
1999, from George French (the "ASAT P.A.") to Connolly, which
states that "[a]fter reviewing all ASAT Sign-in sheets for the
past 4 months Larry Johnson 90T2592 has never signed into any
ASAT group."  It is not apparent from the parties' submissions
or the hearing transcript whether this memorandum was entered
into the record at the hearing, or if Johnson was ever provided
a copy during the hearing process.  Connolly's questioning of
Acevito does strongly imply, however, that Connolly had reviewed
French's memorandum prior to December 16.

disturbance.  Johnson also stated that the officers could
describe Johnson's "rapport and [] interaction with the inmates"
on his unit, and that, because Johnson had "a hard time
communicating" with those inmates, the allegation that he
threatened them was "ludicrous."  Connolly conceded that, if
these officers had heard Johnson making threats, they would have
submitted a misbehavior report, and that because no such reports
were submitted, it could be assumed that these officers would
testify that they did not hear Johnson making any threats.
Johnson eventually agreed, in light of this concession, that
testimony from Hicks and Benedito was not necessary.  Connolly
then filled out, and Johnson signed, a "Form 2176" memorializing
this agreement.

      Johnson concluded his defense by listing a series of
objections to the hearing process as a whole, including, inter
alia, (1) that Connolly violated prison regulations by presiding
over Johnson's hearing after being involved in the investigation
into the charges against Johnson (as evidenced by the December 5
Memo, which was addressed to Connolly); (2) that this
disciplinary action was being taken as revenge for Johnson's
contemplated action against several corrections officers in his
capacity as ILC representative; and (3) that his due process
rights were violated because the evidence against him was not
credible, particularly the allegation that he made threats

13

during ASAT meetings, which the evidence showed Johnson had never attended.

Following Johnson's objections, the hearing was adjourned for approximately twenty minutes, after which Connolly returned and announced that he found Johnson guilty of all charges "based on the information relayed to me during the Hearing on a confidential tape, that I determined to be credible information, and the testimony and written report of Sergeant [Mc]Namara," which "gave specifics to the actions you took to urge this participation." Johnson was sentenced to 18 months in the SHU, 18 months of lost good time credits, loss of packages, commissary, and telephone privileges for 18 months, and removal from his position as ILC representative.

On January 11, 2000, this disposition was affirmed following a discretionary review by First Deputy Superintendent Joseph T. Smith. On January 13, Johnson appealed this result to the Commissioner's office. On the appeal form, Johnson reiterated the objections he offered at the hearing, and added new allegations regarding his treatment following his placement in the SHU. Johnson asserted that, during his admission to the SHU, he was assaulted by three corrections officers, who also confiscated and destroyed his personal property, including his copies of the legal documents related to the hearing. Johnson also alleged on appeal that Mack had failed to assist him by

14

gathering documents or interviewing witnesses, as he had
requested.

In response to this appeal, defendant Selsky issued a
summary disposition reducing each element of Johnson's
disciplinary penalty from 18 months to 9 months.  On June 16,
2000, the Acting Director, Special Housing/Inmate Discipline
reversed the disposition entirely because the tape of the
hearing was incomplete.  The "Hearing Record Sheet" indicated
that an inmate named Deputy and ASAT counselor Walker had
testified at the hearing in Johnson's presence, but their
testimony was not recorded.[8]

At the time the hearing disposition was reversed, Johnson
had already spent more than six months in the SHU.  Johnson
alleges that, during that period, he suffered serious emotional
distress and mental anguish, as a result of which he underwent
psychiatric treatment for post-traumatic stress disorder,
paranoid schizophrenia, and chronic depression.  Following his
release from prison, Johnson filed the instant lawsuit.


DISCUSSION

As noted above, defendants filed a motion for summary
judgment in proceedings before Magistrate Judge Fox.  Summary

---

[8] The transcript provided by the defendants, which appears to be
based on the audio tapes of the hearing, also does not include
testimony from these witnesses.

judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at 169.  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Finally, in applying these standards here, it should also be noted that Johnson is proceeding pro se, and that this Court has an obligation to read his submissions liberally and interpret them to raise the strongest arguments that they suggest.  See, e.g., Wright v. Comm'r, 381 F.3d 41, 44 (2d Cir. 2004).

Magistrate Judge Fox issued a Report recommending that this Court grant in part and deny in part defendants' motion for summary judgment.  The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  The court shall make a de novo determination of the portions of the Report to which either party objects.  Id.; see also United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997).  To accept those portions of the Report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record."  Figueroa v. Riverbay Corp., No. 06 Civ. 5364(PAC), 2006 WL 3804581, at *1 (S.D.N.Y. Dec. 22, 2006) (citation omitted).

The Report makes several recommendations to which neither side has objected.  Those recommendations will be addressed first.

I.  Uncontested Recommendations

A.  Claims Against Greiner, Goord, and Selsky

The Report recommends that summary judgment be granted as to Johnson's claims against these three defendants, none of whom had a direct role in the conduct of the disciplinary hearing. The Report found that the allegations contained in Johnson's complaint, even when interpreted liberally, did not state claims

against these defendants, and that the evidence Johnson offered in opposition to the motion for summary judgment was insufficient to create a dispute as to a material factual issue. Johnson has not objected to this recommendation.  Having reviewed the Report and the record with care, the Report's recommendation on these claims is not clearly erroneous, and is adopted here.

B. Conspiracy Claim

Johnson alleges in his complaint that all of the defendants conspired against him because of his popularity among the prison population, and because he would not collaborate with the defendants in spying on his fellow inmates.  The Report recommends that summary judgment be granted as to this claim because Johnson's complaint and affidavit fail to set forth any facts creating a material factual dispute concerning the elements of a conspiracy, including an agreement among the defendants and an overt act done in furtherance of the alleged conspiracy.  Johnson has not objected to this recommendation. Having reviewed the Report and the record with care, the Report's recommendation on this claim is not clearly erroneous, and is adopted here.

C. Johnson's Liberty Interests

To state a due process claim under Section 1983, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) (citation omitted). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Id. (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).

In their motion papers, defendants contended that Johnson had failed to identify any condition of his confinement that was "atypical or significant," and that summary judgment dismissing Johnson's due process claims was therefore appropriate.  After a review of Johnson's complaint and affidavit, as well as the defendants' submissions, the Report concludes that Johnson has raised genuine issues of material fact concerning the conditions of his confinement insofar as Johnson has averred that (1) he was assaulted upon his admission to the SHU, (2) his personal property was destroyed, (3) he was forced to expose himself in front of a female corrections officer, and (4) he was deprived of certain educational opportunities.  Citing the guidance provided by the Court of Appeals in Palmer v. Richards, 364 F.3d

60, 66 (2d Cir. 2004), the Report concluded that summary
judgment on the Sandin question was not appropriate here.

     In their objections to the Report, defendants state that
they "do not challenge," at this stage, the Report's conclusion
on the Sandin issue.  Having reviewed the Report and the record
with care, the Report's recommendation on this issue is not
clearly erroneous, and is adopted here.  Johnson "should have
the opportunity to demonstrate that the conditions of his
confinement" in the SHU, as compared to "both the conditions in
administrative confinement and in the general prison population
were sufficiently harsh to violate a liberty interest." Palmer,
364 F.3d at 66 (citation omitted).


II.  Johnson's Objections

     Johnson objects only to that portion of the Report
recommending that, to the extent Johnson's pleadings can be read
as bringing claims for monetary damages against the defendants
in their official capacities, those claims are barred by the
Eleventh Amendment.  The precise basis for Johnson's objection
is not clear, but the objection can be swiftly rejected in any
event, as it is well-established that claims for damages against
state officials in their official capacities are considered to
be claims against the State itself and are therefore barred by
the Eleventh Amendment.  See, e.g., Davis v. New York, 316 F.3d

93, 101 (2d Cir. 2002) (citing, <u>inter alia</u>, <u>Kentucky v. Graham</u>,

473 U.S. 159, 169 (1985)).  Johnson's objection is rejected and

the Report's recommendation on this question is adopted.


III.  Defendants' Objections

     Defendants object to those sections of the Report

concluding that (1) defendants are not entitled to qualified

immunity from any of Johnson's claims at this stage, and (2)

summary judgment should be denied as to the claims against

Connolly, McNamara, and Mack, and as to Johnson's retaliation

claim.[9]  These objections will be addressed in turn.


A.  Qualified Immunity

     In the final section of their memorandum of law in support

of the motion for summary judgment, defendants briefly recited

the basic tenets of qualified immunity case law and asserted

that, "[a]s has been demonstrated above, none of the defendants

violated plaintiff's 'clearly established statutory or

constitutional rights of which a reasonable person would have

known' and they should, therefore, be dismissed from this

_____

[9] Defendants argue that, contrary to the analysis provided in the
Report, Johnson's retaliation claim should be considered (and
dismissed) independent of Johnson's due process claims.  This
issue is discussed below.

action." Defendants did not provide further argument on this point in their reply memorandum.

The Report concludes that this perfunctory argument does not satisfy the defendants' burden on the issue of qualified immunity at the summary judgment stage. The Report finds that "defendants failed to present any facts or evidence, in support of their [qualified immunity] defense, to demonstrate to the Court that the defendants' acts were reasonable in light of the clearly established law at the time of the misconduct attributed to them."

Defendants object to this section of the Report, but do not identify any error committed by the Magistrate Judge in arriving at it. Defendants simply "contend that their conduct was objectively reasonable in its entirety," and proceed to raise two brief (and new) arguments with respect to the due process claim against Mack and Johnson's retaliation claim against all defendants. The substance of these arguments will be addressed below as necessary, but they are not sufficient in any event to salvage the defendants' conclusory and belated presentation of the qualified immunity defense. The Report's recommendation that summary judgment not be granted on qualified immunity grounds is therefore adopted here.

As the Court of Appeals has instructed, "because qualified immunity is an affirmative defense, it is incumbent upon the

defendant to plead, and adequately develop, a qualified immunity
defense during pretrial proceedings so that the trial court can
determine which claims, if any, may be disposed of by summary
judgment." Blissett v. Coughlin, 66 F.3d 531, 538 (2d Cir.
1995). Although defendants have not waived the defense by
failing to raise it entirely, as the defendants did in Blissett
and McCardle v. Haddad, 131 F.3d 43, 51-52 (2d Cir. 1997),
defendants' failure to make more than boilerplate arguments in
their motion papers, compounded by their further failure to
relate those arguments to the factual record in this case,
justifies the conclusion that defendants are not entitled to
summary judgment on qualified immunity grounds. While the
Supreme Court has "repeatedly . . . stressed the importance of
resolving immunity questions at the earliest possible stage in
litigation," Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoted
in Saucier v. Katz, 533 U.S. 194, 201 (2001)), this Court is not
required, sua sponte, to develop, analyze, and rule on arguments
where defendants have offered none. Thus, defendants' qualified
immunity defense will have to be evaluated in light of the
evidence and arguments presented at trial.


B.  Claims Against Connolly

     The Report recommends that summary judgment be denied as to
all claims against Connolly because (1) as noted above, there

are genuine issues of material fact concerning Johnson's liberty interests, and (2) Johnson "has alleged retaliatory motive in his complaint." This analysis is flawed.  While Johnson has pleaded a retaliation claim against Connolly and others, he has also pleaded several discrete due process claims against Connolly, and supported those pleadings with the factual allegations contained in his affidavit.  Specifically, Johnson claims that Connolly violated his due process rights (1) by presiding over the disciplinary hearing despite the fact that he was involved in the investigation of Johnson's alleged wrongdoing, and (2) by finding Johnson guilty despite the fact that there was no credible evidence supporting that outcome.[10] Defendants moved for summary judgment as to both of these claims, arguing that (1) Johnson's allegations of bias were not sufficient to render Connolly's decision to preside at the hearing a violation of Johnson's due process rights, and (2) the hearing disposition was supported by "some evidence," as required under Superintendent v. Hill, 472 U.S. 445, 455 (1985).

---

[10] Johnson's pleadings also might be read to include a claim that Connolly denied Johnson an opportunity to call all of the witnesses he desired at the hearing.  As the discussion above demonstrates, however, such a claim would be without merit.  The only witnesses Johnson requested who were not called were officers Hicks and Benedito.  Johnson, however, agreed orally and in writing that their testimony was not necessary after Connolly conceded that they would testify that they had not heard Johnson make any threats.  This claim will therefore not be addressed further.

The fact that Johnson has alleged that the defendants were
retaliating against him for various reasons is not directly
relevant to the question raised by defendants' motion: whether
there are genuine disputes over facts material to the elements
of these specific claims that preclude the entry of summary
judgment.  That question will be addressed here; Johnson's
retaliation claim will be addressed separately below.


1.  Connolly as Hearing Officer and Investigator

    It is undisputed that Johnson had a constitutional right to
have a "fair and impartial hearing officer" preside over his
disciplinary hearing.  See, e.g., Sira v. Morton, 380 F.3d 57,
69 (2d Cir. 2004).  Johnson alleges that this right was violated
when Connolly presided over his disciplinary proceeding because
Connolly was involved in the investigation of the allegations
against Johnson.  Johnson supports this claim by averring that
(1) the December 5 Memo, which reported the results of
McNamara's investigation into Johnson's suspected wrongdoing,
was addressed to Connolly, and (2) that Connolly was in charge
of security at Sing Sing, and thus it was his job to
investigate, and have knowledge of, any alleged wrongdoing at
the facility.[11]

---

[11] As noted above, Johnson also alleges that Connolly overheard
his December 7 conversation with Mack.  He does not appear to

"It is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." <u>Allen v. Cuomo</u>, 100 F.3d 253, 259 (2d Cir. 1996).  As the Court of Appeals has long recognized, "[b]ecause of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." <u>Francis v. Coughlin</u>, 891 F.2d 43, 46 (2d Cir. 1989).  Given this relatively flexible standard, the allegation that Connolly had been made aware of the charges against Johnson prior to the hearing as a result of receiving the December 5 Memo, and speculation that Connolly may have been "involved in some degree[] with the investigation of the incident" due to his general job responsibilities, do not create a genuine issue of material fact regarding Connolly's fitness to preside over Johnson's hearing.  There is no evidence that Connolly was the investigating officer or otherwise played any substantial role in developing the evidence either to bring charges against Johnson or to present at the hearing.  Indeed, Connolly stated at the hearing that he had not actually seen the December 5 Memo prior to the time at which it was given to

---

claim, however, that this is a basis for finding that Connolly was too biased to preside over his hearing.

Johnson.[12]  Summary judgment is therefore appropriate as to this claim.

2.  Evidentiary Basis for the Hearing Disposition

     "[P]rison discipline decisions affecting an inmate's liberty interest cannot be 'imposed arbitrarily' but must be 'supported by some evidence in the record.'"  Sira, 380 F.3d at 76 (quoting Hill, 472 U.S. at 454).  The Supreme Court has cautioned that an "'examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence'" is not necessary in order for a reviewing court of determine whether the evidence in the record meets this standard.  Id. (quoting Hill, 455-56).  The Court of Appeals has clarified, however, that "only 'reliable' evidence can constitute 'some evidence'" under Hill.  Id. (citation omitted).  This proposition is grounded in the understanding that due process mandates not just a hearing before a deprivation of liberty, but requires more precisely that an

---

[12] Johnson focuses on the fact that prison regulations provide that an administrator who investigated a particular incident must not preside over the disciplinary hearing regarding that incident.  Since Johnson has not produced evidence that Connolly was an investigating officer for these charges, there is no need to consider this legal issue further, other than to note, as the Court of Appeals did in addressing a similar claim, "[f]ederal constitutional standards rather than state statutes define the requirements of procedural due process."  Russell v. Selsky, 35 F.3d 55, 60 (2d Cir. 1994) (citation omitted).

inmate "receive a fair hearing." Id. at 77. Thus, where the evidence offered at the disciplinary proceeding is elicited from confidential informants, such evidence can satisfy the "some evidence" standard only if the hearing officer conducts an "examination of indicia relevant to [the informant's] credibility," including the "factual basis for [the] witness's conclusions." Id. at 77, 80 (citation omitted). Moreover, when the accused prisoner is not permitted to confront and cross-examine the confidential witnesses, the hearing officer's duty to "conduct an independent assessment of informant credibility . . . is heightened." Id. at 78.

Connolly stated on the record that he found Johnson guilty of the charges contained in the misbehavior report "based on the information relayed to me during the Hearing on a confidential tape, that I determined to be credible information, and the testimony and written report of Sergeant [Mc]Namara," which "gave specifics to the actions [Johnson] took to urge this participation." McNamara's "written report" -- i.e., the December 5 Memo -- is simply a non-confidential summary of the evidence purportedly provided by the confidential informants, which McNamara reviewed in greater detail on the confidential tape, and thus was not, strictly speaking, an independent source of evidence. McNamara's testimony on the confidential tape, however, was based on what he was told by two confidential

28

informants, Benjamin and Prentice.  As described above, McNamara
reported that Benjamin had been involved in the planning of the
prison protest and had told him that "Johnson's role was to
encourage others to get the word out and report back to the
committee on people who were not complying."  McNamara's belief
in Benjamin's credibility appears to have been based on the
following factors: (1) that other information Benjamin provided
about this event (though not about Johnson specifically) was
independently confirmed by other unnamed informants, (2) that
Benjamin was "well aware of all participants" because he was
"part of the committee planning this," and (3) that Prentice had
independently told McNamara that Johnson, during ASAT meetings,
was encouraging inmates to participate in the protest, and was
threatening those that would not participate.  Connolly,
however, did not ask for, nor did McNamara provide, the dates,
times, or places that Johnson was alleged to have met with
Benjamin and agreed to encourage or threaten others to
participate in the planned protest.[13]

After Johnson received a copy of the December 5 Memo, which
gave Johnson notice of some of the factual allegations that

---

[13] McNamara also reported that he had received "confidential
anonymous notes . . . regarding generic ILC's and some physical
description that may nor may not have fit Inmate Johnson."
Copies of those notes do not appear to have been provided to
Connolly or Johnson, and are not in the record.  Defendants do
not point to this evidence as support for the hearing outcome.

McNamara relayed on the confidential tape, Johnson requested
that documents and testimony be collected and placed in the
record to prove that Johnson was not a member of ASAT, and thus
could not have made threats during meetings of that group.  The
testimony later provided by Officer Acevito and the memorandum
from ASAT counselor French proved that Johnson had not attended
an ASAT meeting in the previous four months.[14]  Johnson also
denied that he misused his ILC position, although he does not
appear to have offered documents or testimony in support of that
denial.  Johnson, however, was not provided any factual basis
for this allegation, nor was he provided notice of the substance
of Benjamin's testimony, other than the statement in the
December 5 Memo that "[c]onfidential sources have identified
this inmate as being involved in the recruiting for and
implementation of this action."  Johnson was also never given
the information he requested regarding the dates and times he
was alleged to have been involved in the misconduct at issue.

     Viewing this record in the light most favorable to Johnson,
summary judgment in favor of Connolly on this due process claim
is not appropriate.  The evidence elicited by Johnson thoroughly
undermined Prentice's credibility, which was the basis for the
allegations in the December 5 Memo regarding Johnson's conduct

---

[14] Although it does not appear on the transcript, Johnson avers
that the testimony offered by inmate Deputy and ASAT counselor
Walker also supported Johnson's defense on this point.

at ASAT meetings, and which was also the only independent
confirmation of Benjamin's allegations about Johnson,
allegations that were bereft of any detail about Johnson.  Given
that Johnson was shown not to have attended an ASAT meeting for
at least the four months prior to the hearing, Prentice's
assertions that Johnson was his "[ASAT] group leader," and that
Johnson "used the ASAT meetings as a forum to promote this
demonstration," were not credible.  In addition, the allegation
in the December 5 Memo that "[confidential] sources further
stated that this inmate used his ILC status to recruit other
inmate[]s to become involved in this demonstration" was not
supported by any evidence presented on the confidential tape, or
introduced during the hearing itself.  Johnson was not able to
offer documents or testimony to rebut this charge, but this is
not surprising in light of the fact that Johnson was not
provided specific dates, times, or places that he was alleged to
have engaged in such conduct.

Once these two bases for the disposition are placed aside,
McNamara's account of Benjamin's testimony is the sole remaining
evidence in support of Johnson's punishment.  In light of the
record here, it cannot be concluded as a matter of law that this
testimony supplied the required "some" reliable evidence in
support of Johnson's hearing disposition.  Confidential
testimony can satisfy the "some evidence" standard provided that

the hearing officer conducts "some inquiry to determine whether
the totality of the facts and circumstances reasonably supports
the proffered conclusion." Sira, 380 F.3d at 80; see also
Taylor v. Rodriguez, 238 F.3d 188, 194 (2d Cir. 2001). Connolly
did question McNamara in order to determine whether Benjamin was
a credible source of information regarding who was participating
in the planned protest. Connolly did not, however, seek out the
factual basis for Benjamin's allegations against Johnson, such
as where and when Benjamin spoke with Johnson or, if they did
not speak directly, who told Benjamin about Johnson's
involvement. Given the facts of this case, this was problematic
for two reasons.

First, because he had no notice of the dates and times of
his alleged offenses, Johnson was "deprived . . . of any
opportunity to explain or challenge this inculpatory evidence."
Sira, 380 F.3d at 75. "[I]t is well established" that an inmate
has a "right to know the evidence upon which a discipline ruling
is based," because "[s]uch disclosure affords the inmate a
reasonable opportunity to explain his actions and to alert
officials to possible defects in the evidence." Id. at 74. As
Johnson repeatedly stated during the hearing, he was not
provided that opportunity.[15]

---

[15] Of course, safety considerations can provide a justification
for limiting the disclosure of certain evidence to an inmate.

Second, establishing the factual basis for Benjamin's accusations was particularly crucial here because Johnson was later able to discredit the only independent source confirming Benjamin's allegations regarding Johnson's involvement in the planned protest.  If Prentice's statements had withstood scrutiny, they would have provided the requisite corroboration of Benjamin's allegations, and the "some evidence" standard would be satisfied.  Absent such corroboration, however, Connolly's failure to determine the factual basis for Benjamin's statements -- either for the purpose of determining the reliability of Benjamin's accusations or in order to provide Johnson an opportunity to rebut this evidence -- left the hearing record in such a state that it cannot be concluded as a matter of law that the outcome of Johnson's disciplinary hearing was supported by "some" <u>reliable</u> evidence.  Summary judgment on this claim is therefore not appropriate.


C.  Claim Against McNamara

The Report also recommends that the defendants' motion be denied as to the claims against McNamara, but fails, as it does with respect to the claims against Connolly, to address

---

Defendants do not urge this point here.  In any event, it is not apparent from the record why Johnson could not have been told, for example, that he would have to account for his whereabouts or actions on a particular day in order to determine whether he might have met with Benjamin or another conspirator.

Johnson's specific claims and whether Johnson has raised issues
of fact material to those claims.  Read liberally, Johnson's
complaint and affidavit allege that McNamara violated his due
process rights by failing to provide him sufficient notice of
the charges against him.  Johnson avers that McNamara prepared a
misbehavior report that was "vague" and did not provide
sufficient detail regarding what Johnson was alleged to have
said and done.

     "Due process requires that prison officials give an accused
inmate written notice of the charges against him twenty-four
hours prior to conducting a disciplinary hearing."  Sira, 380
F.3d at 70 (citing Wolff v. McDonnell, 418 U.S. 539, 564
(1974)).  Such notice is not an "empty formality," particularly
when, as in this case, "large parts of the disciplinary hearing
are conducted outside the inmate's presence."  Id.; see also
Taylor, 238 F.3d at 192-93.  To satisfy due process, the notice
must contain "sufficient factual specificity to permit a
reasonable person to understand what conduct is at issue so that
he may identify relevant evidence and present a defense."  Id.
at 72 (citing Wolff, 418 U.S. at 564).  Where possible, the
notice should include information about the date, place, and
manner of the alleged misconduct.  When that information is
unavailable, the notice should explain that that information is
unknown.  Id.

Under this standard, the notice supplied by McNamara in the misbehavior report was clearly insufficient.  As the Court of Appeals held in Sira, a notice that simply alleges that an inmate "urged," "organized," or "threatened inmates to participate" in a prison disturbance, without providing further factual detail, does not satisfy the requirements of due process.  Id. at 70; see also Taylor, 238 F.3d at 193-94.  The misbehavior report here consists of precisely this kind of language.

In their objections, defendants argue that the December 5 Memo, which was provided to Johnson during the hearing on December 13, cured any defect contained in the original notice, both because it provided sufficient factual detail and because Johnson was given the required twenty-four hours to review it before the hearing resumed.  (In fact, the hearing resumed three days later, on December 16.)  Although the Court of Appeals hypothesized in Sira that a defective notice might, in some circumstances, be cured by a disclosure made at the hearing itself, provided that the inmate is "also afforded the meaningful opportunity to prepare a response to the new information," Sira, 380 F.3d at 72, what impact the initial defective disclosure had on Johnson is a question of fact that may not be resolved at summary judgment.

For example, it is defendants' contention that the
Assistant Form written by Mack is an accurate account of what
Johnson asked Mack to compile for him in anticipation of his
hearing.  Assuming for the moment that the evidence at trial
will support that claim, the prejudice to Johnson from the
insufficient initial notice is apparent:  if the form is
accurate, Johnson was not able to ask Mack to gather for him
anything more specific than the "evidence causing him to be
implicated," because Johnson was not aware, prior to the
hearing, of the specific factual allegations underpinning the
charges contained in the misbehavior report.  Moreover, Mack
appears to have ceased assisting Johnson as of December 11.
Thus, it appears that Johnson was unable to make meaningful use
of his inmate assistant prior to his hearing as a direct result
of the inadequate notice provided in the misbehavior report.  In
addition, it should also be noted that even the December 5 Memo
did not provide notice of the dates, times, or locations at
which the alleged misconduct took place.  Viewing the record in
the light most favorable to Johnson, it cannot be said that, as
a matter of law, Johnson was not prejudiced by the receipt of a
manifestly defective notice prior to the commencement of his
disciplinary hearing.

D.  Claim Against Mack

Johnson avers that, in his initial meeting with Mack on December 7, he asked Mack to interview witnesses in Johnson's unit at Tappan, collect written statements, obtain any "Unusual Incident" reports, as well as any other documentary evidence -- including, inter alia, the "inmate rule book," a copy of Chapter V, any relevant "TO/FROM reports," and other reports, memoranda, and recordings created by anyone in the prison -- that would be relevant to the charges contained in the misbehavior report. Johnson further avers that, in their subsequent meeting on December 10, Mack only provided him with a copy of the inmate rule book and Chapter V, and did not provide any other information.

The Report reviews these allegations, as well as the defendants' submissions, and concludes that because the record was devoid of any evidence demonstrating that Mack attempted to interview witnesses or gather any of the requested evidence, summary judgment must be denied on this claim.  The Report also concludes that a harmless error analysis is not appropriate here and, in any event, summary judgment should not be granted on that ground because genuine issues of material fact exist concerning the impact of Mack's performance on the outcome of the disciplinary proceeding.  Defendants have objected to each of these conclusions, arguing that the record demonstrates that

all of Johnson's requests were honored, unreasonable, or
immaterial; that a harmless error analysis should apply; and
that any failing by Mack was remedied during the course of the
disciplinary proceeding, in which Johnson was provided (to the
extent permitted) the evidence against him and given the
opportunity to present an effective defense.

Prison officials have an obligation to provide assistance
to an inmate "in marshaling evidence and presenting a defense
when he is faced with disciplinary charges." Eng v. Coughlin,
858 F.2d 889, 897 (2d Cir. 1988); see also Ayers v. Ryan, 152
F.3d 77, 81 (2d Cir. 1998).  Defendants do not contest that,
under the circumstances presented here, Johnson had some right
to assistance in gathering evidence to present his defense,
although they contend that Mack was not required to obtain
irrelevant or non-existent documents, or act as a "private
investigator" in seeking out evidence in support of Johnson's
defense.  Whatever the validity of those asserted limitations on
Johnson's right to assistance, it cannot be concluded from the
record here that Mack satisfied his obligations to Johnson.
Viewing the record in the light most favorable to Johnson, it
appears that Mack did nothing in response to Johnson's requests
that Mack, inter alia, interview the inmates on his unit or
determine what the evidence was against him.  The Assistant
Form, which Johnson refused to sign in light of these failures,

38

indicates only that Johnson would be provided such information "at [the] hearing."[16]

Defendants argue that it is permissible for the assistant to defer requests to the hearing officer, citing Pilgrim v. Luther, No. 01 Civ. 8955 (RCC), 2007 WL 233203 (S.D.N.Y. Jan. 24, 2007). Whether it is appropriate to defer some investigative tasks to the hearing must be resolved on a case-by-case basis. Whether it was appropriate to defer any part of the investigation in Pilgrim provides little guidance here. Johnson has presented sufficient evidence to permit a jury to conclude that Mack failed woefully in his obligation to assist Johnson. As the record stands now, a reasonable juror could conclude that, as in Eng, Mack "interviewed no witnesses and conducted no investigation" of the incidents alleged in the

---

[16] The requests listed on the copy of the Assistant Form submitted in support of the defendants' motion differ somewhat from the requests Johnson avers that he made at that time. The requests listed on the form are: (1) how many times Johnson's cell was frisked regarding this misbehavior report; (2) information on who ordered the investigation; (3) information on how long the investigation took; (4) a copy of the inmate rule book; (5) evidence implicating Johnson; (6) relevant written statements, videos, and tapes; and (7) Unusual Incident reports from October 21 to December 5. The form also contains defendant Mack's notations regarding what he provided Johnson. As to request 1, no notation is made. As to requests 2, 3, 5, and 6, the notation reads "At Hearing." As to request 4, the notation indicates that a copy of the rule book was provided. As to request 7, the notation reads "None," which defendants submit indicates that there were no Unusual Incident reports meeting the criteria stated. Next to the section of the form provided for the inmate's signature, the text reads "REFUSED."

misbehavior report, despite Johnson's requests and in violation
of Johnson's due process rights.  Eng, 858 F.2d at 891; see also
Ayers, 152 F.3d at 81.[17]

Defendants argue at some length in their objections to the
Report that a harmless error analysis is appropriate here,
citing Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991), and
that such an analysis supports summary judgment as to Johnson's
assistance claim.  Whether or not Powell should be read to
support the notion that harmless error analysis is appropriate
(or even mandatory) when reviewing an inmate's Section 1983
claim in the prison disciplinary context,[18] the Report's

---

[17] Defendants also argue that Mack was not required to conduct
the requested interviews because of the "sweeping nature" of
Johnson's requests.  As noted above, however, reading the record
in the light most favorable to Johnson, the vagueness of
Johnson's request can be attributed to McNamara's failure to
provide Johnson with sufficient notice of the factual basis for
the allegations against him, as well as Mack's own failure to
obtain a copy of the December 5 Memo prior to the hearing,
either of which would have enabled Johnson to make more specific
requests.

[18] In Powell, the Court of Appeals reviewed the report of a
Special Master appointed to oversee compliance with an
injunction requiring the officials at Bedford Hills Correctional
Facility to conduct disciplinary proceedings in conformity with
the procedural requirements articulated in Wolff.  See 953 F.3d
at 744-46.  In the Special Master's ninth annual compliance
report, she recommended reversal of the outcomes of several
individual disciplinary proceedings, including in one case in
which the hearing officer had verified one of the inmate's
assertions by conducting his own brief investigation, thereby
violating the injunction's dictate that a person who has
participated in any investigation of the acts complained of may
not serve as a hearing officer.  Id. at 750.  It was in this
context that the Court of Appeals stated, "[i]n the absence of a

recommendation that summary judgment on such grounds is not
justified in any event will be adopted here.  For example, had
Mack made some effort to inquire into the basis for the charges
against Johnson (as Johnson requested), he likely would have
discovered the December 5 Memo, which would have given Johnson
notice of the factual basis for some of the charges against him
prior to the hearing, while Mack was still acting as his
assistant.  As the record stands now, however, it appears that
Johnson was only made aware of that evidence during the hearing,
after Mack had ceased assisting him.  As a result, Johnson had
to fend for himself during the hearing in attempting to
understand the nature of the charges against him and determining
which witnesses to call.  In addition, had Johnson had the
opportunity to challenge, at the beginning of the hearing and
prior to the confidential colloquy, the accusations regarding
his conduct during ASAT meetings, Connolly would likely have

---

recent pattern of [due process] violations, it is entirely
inappropriate to overturn the outcome of a prison disciplinary
proceeding because of a procedural error without making the
normal appellate assessment as to whether the error was harmless
or prejudicial." Id.  Several district courts in this Circuit
have found that a harmless error analysis should be conducted in
cases such as Johnson's.  See, e.g., Pilgrim, 2007 WL 233203, at
*5 (citing Powell); Marino v. Humphrey, No. 05 Civ. 6571, 2006
WL 2786182, at *5 (S.D.N.Y. Sept. 27, 2006) (same).  On the
other hand, the Court of Appeals has reversed grants of summary
judgment on failure-to-assist claims without conducting a
harmless error analysis, at least where the assistant provided
no assistance at all.  See Ayres, 152 F.3d at 80-81.  As noted
above, however, this debate need not be resolved here.

viewed Benjamin's allegations in a different light and, in turn, questioned whether either inmates or prison officials had some reason to fabricate evidence against Johnson.  Understanding that Prentice's information was entirely discredited, Connolly may very well have pressed McNamara for details about Benjamin's report and viewed those accusations with more skepticism.  Thus, viewing the record in the light most favorable to Johnson, even assuming that harmless error analysis is appropriate here, there are genuine issues of material fact concerning the prejudice suffered by Johnson as a result of Mack's failures, and thus summary judgment is not appropriate on a harmless error theory.[19]

---

[19] As noted above, the defendants belatedly raised the argument that it was "not clearly established that a cause of action may be maintained in the absence of a showing that Mack's conduct was prejudicial" and that it therefore "would have been objectively reasonable for Mack to conclude that only those inadequacies resulting in prejudice to plaintiff were outside the law."  As the Court of Appeals held in Ayres, however, "[t]his Court's decision in Eng v. Coughlin, 858 F.2d 889, 898 (2d Cir. 1988), clarified for 'future cases' that an inmate transferred between facilities has the right to good faith assistance, and that 'an assigned assistant who does nothing' violates due process."  Ayres, 152 F.3d at 82.  Thus, it was clearly established as of at least 1988 that the kind of assistance provided by Mack here did not satisfy due process. Moreover, as the discussion above demonstrates, whether it might have been objectively reasonable for Mack to conclude that he need not provide any assistance as long as Johnson would not suffer any prejudice is a hypothetical scenario not presented by this case.

E.  Retaliation Claim

      The Report analyzed Johnson's retaliation allegations as a
factor to be considered in deciding whether Johnson's other
claims against Connolly and McNamara should survive the
defendants' motion, and not as a separate claim.  As noted
above, this was error; the retaliation claim must be analyzed on
its own merits.

      Johnson's complaint alleges that the defendants "conspired
against him . . . because of his popularity among the prison
population," and "single[d] him out and used him as a scapegoat
because he wouldn't collaborate with them to make daily reports
and spy on the Inmate population."  Even if these allegations
had been repeated in Johnson's affidavit, they would not be
sufficient to support a retaliation claim.

      "In order to prevail on [a] retaliation claim[]," a
plaintiff "bears the burden of showing, first, that he engaged
in constitutionally protected conduct and, second, that the
conduct was a substantial or motivating factor for the adverse
actions taken by prison officials."  Bennett v. Goord, 343 F.3d
133, 137 (2d Cir. 2003).  The Court of Appeals has cautioned
that, "because prisoner retaliation claims are easily
fabricated," a court must be "careful to require non-conclusory
allegations" at the summary judgment stage.  Id. (citation
omitted).

43

In comparing Johnson's allegations with the retaliation claims that survived summary judgment in Bennett, Davis v. Goord, 320 F.3d 346 (2d Cir. 2003), and Gayle v. Gonyea, 313 F.3d 677 (2d Cir. 2002), it is apparent that Johnson's claim falls short.  Even assuming that the conduct Johnson identifies is constitutionally protected, his allegations regarding the connection between this conduct and the disciplinary hearing are precisely the kind of conclusory allegations that the Court of Appeals has indicated are insufficient in this context.  Summary judgment will therefore be granted as to this claim.[20]

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to (1) all claims against defendants Greiner, Goord, and Selsky, and (2) Johnson's conspiracy and retaliation claims, and denied as to Johnson's (1) insufficient evidence claim against defendant Connolly, (2) failure-to-assist claim against defendant Mack, and (3) inadequate notice claim

---

[20] In light of this holding, defendants' argument that it was not clearly established that Johnson had a right to refuse to cooperate with the defendants in combating inmate misconduct need not be addressed here.

against defendant McNamara. A separate order issued today will set forth a schedule for subsequent proceedings in this case.

SO ORDERED:

Dated: New York, New York
September 28, 2007

_____
DENISE COTE
United States District Judge

COPIES SENT TO:

Larry Johnson
584 Logan Street, Apt. 1C
Brooklyn, NY 11208

Steven N. Schulman
Office of the Attorney General
New York State
120 Broadway
New York, NY 10271